In the Matter of the Probate of a Paper Writing Purporting to
be the Last Will and Testament of GEORGE W. HORTON,
Deceased.

JANE ANN DICKIE, Appellant; ALICE M. HORTON, Respondent.

Second Department, December 8, 1916.

Will — decree refusing probate upon ground that testator was non-resi-
dent reversed — proof establishing that decedent was resident of this
State — mentally incompetent cannot have intention to change domi-
cile — evidence — presumption that original domicile continues —
appeal — power of Appellate Division on. appeal from decree of Sur-
rogate's Court.

Appeal from a decree of the Surrogate's Court denying probate to a will
upon the ground that the testator had changed his residence to a foreign
State, in which State a later will had been admitted to probate. The
decedent, when over eighty years of age and apparently impaired both
physically and mentally, had married a woman, resident of the foreign
State, but after a short period had returned to this State to live with
his daughter, the proponent of the prior will. Evidence examined, and
held, that a finding that the decedent had changed his residence to the
foreign State was clearly against the weight of the evidence, and that a
contrary finding should have been made.

As the decedent had been continuously a resident of this State for nearly
eighty years, his original domicile is presumed to continue, and the bur-
den to establish affirmatively that he intended to change his domicile
was upon the contestant.

If from the time the decedent went to the foreign State until the date of
his death he was mentally incompetent to form or have an intention to
change his domicile, he was powerless to change the same.

While the Appellate Division has power, under section 2763 of the Code of
Civil Procedure, to decide the questions of fact involved upon the evi-
dence, and to determine that the decedent was still domiciled in this
State at the time of his death, the case will be remitted to the Surro-
gate's Court for a new trial, as the contestant may elect not to stand
upon the record of the foreign probate of the later will, and may attempt
to prove the same in the Surrogate's Court.

APPEAL by the proponent, Jane Ann Dickie, from a decree
of the Surrogate's Court of the county of Westchester, entered
in the office of said Surrogate's Court on the 18th day of July,
1916.

*Henry G. K. Heath*, for the appellant.

*William H. Sommer*, for the respondent.

Mills, J.:

This is an appeal by the proponent from a decree of the Surrogate's Court of Westchester county, entered July 18, 1916, denying the petition herein for the probate of the will of George W. Horton, deceased, dated April 5, 1902, and dismissing the proceedings herein.

The alleged testator died in the State of Ohio on September 14, 1913, at the age of over eighty-six years. He was born on City Island, then Westchester county, now New York city and the county of Bronx, on September 14, 1827, and lived on City Island until about 1906, when he moved with his daughter, the proponent, to White Plains, where he remained for the most part until about July 1, 1913, when he went to the State of Ohio and remained there until his death. His business before he went to White Plains was that of a pilot through the Hell Gate waters. I do not find any statement of the death of his first wife, the mother of the proponent, although evidently that had antedated the making of the will here propounded, which was dated April 5, 1902, and described him as a resident of City Island and gave the bulk of his estate to his grandchildren, the children of the proponent. He was married to the contestant on September 10, 1912.

The petition of the daughter, who was named as executrix in the said instrument, was presented to the Surrogate's Court of Westchester county on September 18, 1913, and alleged that at the time of his death the decedent was a resident of White Plains and left real and personal property within the county of Westchester. The answer of the contestant, the widow, denied that said paper writing was his last will and testament and affirmatively alleged that on the 8th of August, 1913, he executed another paper at Painesville, O., as and for his last will and testament, and that the same had been duly probated as such in that State.

At a former trial of the issues thus joined the said Surrogate's Court rejected the offered record of the proceedings of the Ohio Probate Court admitting to probate the said alleged will dated

August 8, 1913, upon the ground that the proceedings in that court had been taken without any notice to the heirs and next of kin of the decedent who reside in this State. Upon appeal here the decree of that court was affirmed (169 App. Div. 292), but the Court of Appeals, upon the appeal taken to it, reversed the judgment entered upon our decision and remitted the matter to the Surrogate's Court for a rehearing (217 N. Y. 363). That court in its opinion, written by HISCOCK, J., held, in effect, that to the validity of the Ohio probate decree it was immaterial that it appeared that no notice of the probate proceedings was in any way given to such heirs or next of kin, as the proceeding was one *in rem* and the Ohio statutes did not require such notice, but that the jurisdiction of the Ohio court was dependent upon the fact that decedent died domiciled in that State, and that in the proceedings in the Surrogate's Court here it was competent for the proponent to litigate that question of fact, viz., the issue of such domicile. Thereafter the matter was remitted to the said Surrogate's Court and a new trial had. Thereat evidence was introduced by both parties and the learned surrogate found and decided that the decedent died " a resident of and domiciled in Painesville, Lake county, in the State of Ohio," and that, therefore, the petition herein should be denied and the proceedings dismissed, and the decree appealed from was entered accordingly.

The main question presented by the appeal, therefore, is whether or not that finding of domicile is sustained by the evidence. After reviewing the evidence and considering the arguments submitted by the learned counsel in their respective briefs, I feel convinced that such finding was clearly against the greater weight of the evidence, and that, indeed, the contrary finding should have been made.

In 1906, when decedent practically retired from his life business and went with his daughter, the proponent, to reside with her at White Plains, he was then nearly eighty years of age. He appears to have been in the habit of going about considerably until at least about 1907. Apparently he met the contestant, then a Mrs. McCaslin, at Thomasville, Ga., in the winter of 1903, and first went to her residence at said Painesville, O.,

in 1911. There he met Dr. Swan, a female physician, an evident friend of the contestant, who thereafter figured conspicuously in the affair of the contestant with him. In 1912, while on a visit to Ohio in the fall of that year, he, with Dr. Swan and the contestant, went to Windsor, Can., and the contestant and he were there married. The marriage certificate in evidence shows that his age was given as seventy-one, although in fact he was then eighty-five; and it was stated that she was a " widow divorced," whatever that may mean. Dr. Swan appears in the certificate as the only witness besides the officiating clergyman's wife. After the marriage the party soon returned to Ohio, and he purchased a house at Painesville, where the contestant resided, and conveyed it to her through Dr. Swan. All three of the deeds in that transaction were dated and acknowledged on September 26, 1912, and in them he assumed the payment of the outstanding mortgages for $2,000. The last deed, the one from Dr. Swan to Mrs. Horton, was not recorded until September 12, 1913, only three days before his death. In his deed to Dr. Swan he was described as " of New York City, N. Y." Shortly after that transaction he returned to his daughter at White Plains, and she did not learn of the marriage until June, 1913. In November, 1912, he registered and voted at White Plains in the general election. In January, 1913, he made a brief visit to the contestant at Painesville, O., and there met Dr. Swan, and also stayed at the latter's place some ten days. In June, 1913, Mrs. Horton came to White Plains alone and failed in an effort to get him to go with her to Ohio. About the 1st of June, 1913, Dr. Swan wrote a confidential letter to Dr. Zacharie, who was his physician at White Plains, informing him that Mr. Horton had a wife in the writer's neighborhood, and that she wished to get him to go with her, and the writer sought the doctor's good offices in aid of the project. It is significant that in that letter the writer spoke of the marriage, then about nine months past, as " secret," viz.: " I prefer that at present you do not tell him that you are wise to his secret."

On July 1, 1913, Mrs. Horton came again to White Plains with Dr. Swan, and they succeeded very shortly in getting

decedent to leave with them and go to the Hotel Seymour in New York city, where, on the following day, he executed to his wife, the contestant, a deed of all of his real estate, which was in White Plains, and an assignment of a mortgage, which appear to have constituted all his property. In both those instruments he was described as residing in the village of White Plains. Upon the very date of such execution, viz., July 2, 1913, the party of three, namely, Mr. and Mrs. Horton and Dr. Swan, started by train for Ohio. There they went to Dr. Swan's home, which was some ten miles from that of the contestant. On August 8, 1913, he executed a purported will, giving all his property to his wife, and in the instrument he was described as of the city of Painesville, county of Lake and State of Ohio. At the time of his death, his daughter, the proponent, had recently instituted in this State incompetency proceedings against him. Shortly after his death the proponent instituted these proceedings to probate the will of 1902. After that will was admitted to probate and letters testamentary thereon issued to proponent, she began in this court an action to set aside the deed and assignment of mortgage executed by him on July 2, 1913, at the Hotel Seymour, upon the ground that he was then mentally incompetent to execute such instruments. Almost simultaneously with the decision of the Court of Appeals setting aside that probate and revoking such letters, that case having been tried at the Westchester Special Term before Mr. Justice YOUNG, was by him informally decided in favor of the proponent by a memoranda of decision filed March 8, 1916. The surrogate excluded that memorandum as no formal decision or judgment had been entered. It was apparently considered that the decision of the Court of Appeals made the entry of such decision or judgment impossible.

The crucial question upon this appeal is this: Did the decedent from July 1, 1913, to his death, have sufficient mental capacity to form and have the requisite intent to change his domicile from New York, which had always theretofore been such, to Ohio? The evidence established abundantly that this State was the decedent's domicile of origin and had remained his domicile throughout his long life, unless from July 1, 1913, when his wife succeeded in getting him to leave White Plains,

to September 14, 1913, when he died there, he changed his
domicile from New York to Ohio.   In order to have done that,
he must not only have changed his physical presence from the
one State to the other, but he must have done so with the
intent of thereby abandoning his former domicile in this State
and acquiring one in Ohio as his sole domicile.   As the
domicile of origin is presumed to continue, the burden of proof
rested here upon the contestant to establish affirmatively the
fact of such intention.   (*Dupuy* v. *Wurtz*, 53 N. Y. 556, 561;
*Matter of Newcomb*, 192 id. 238.)

Where, as here, the domicile of origin continued so long,
namely, through eighty-six years and the entire period of an
active life, that presumption of continuance may be especially
strong.   Manifestly if the decedent, from July 1 to Septem-
ber 14, 1913, the date of his death, was mentally incompetent
to form and have such an intention, then he could not have so
changed his domicile.   I think that much the greater weight
of the evidence showed that he had not then that degree of
mental strength and capacity.   I reach this conclusion for the
following reasons, viz.:

(1) The decedent was then at an advanced age, over eighty-
six years, and evidently had reached, for him, what may be
termed the breaking point of life.

(2) He was concededly in a very weak physical condition.
His regular physician at White Plains so testified as to his con-
dition on July first.   Such fact was shown also by the testi-
mony of the hackman, who had known him well, and by that
of the daughter.   Dr. Swan, the friend and aid of the contestant,
in effect testified to the same result.   Indeed his condition was
such that the contestant felt that she needed a physician
companion to take him with her to Ohio.

(3) His mental condition was correspondingly weak.   His
White Plains physician, who appears to be disinterested and
who had attended him professionally apparently for some time,
testified to his feeble mental condition and to his opinion that
the decedent was not competent or able " to form and carry
out a purpose to change his domicile from New York to Ohio."
Other testimony indicated the same.

(4) The   general   situation, to my mind, speaks   forcibly

against the contestant and her contention here. She, a "widow divorced" of fifty-three years of age, with her friend Dr. Swan, took the decedent, then over eighty-five years of age, to Windsor, Can., in September, 1912, about a year before his death, and married him. Shortly thereafter he returned to his daughter at White Plains. The marriage was kept secret from the daughter until the following June. Dr. Swan was evidently privy to such secrecy. The contestant, in June, 1913, came here to White Plains and vainly tried to get the old man to leave his daughter. Then, upon her return to Ohio, she evidently appealed to Dr. Swan and the doctor wrote confidentially to Dr. Zacharie, his White Plains physician, to enlist him in their behalf. Then the two appeared at White Plains on July first, and in a few hours succeeded in getting the old man, then in a very feeble condition, to go with them to a hotel in New York city and there, within a few hours, have him deed and convey to the contestant all his property. Then they at once took him to Painesville, O. For the few weeks of his living in Ohio he was part of the time with Dr. Swan, at her home, and part of the time with his wife at hers, and part of the time in a sanitarium. The contestant evidently came east during that period to defend the incompetency proceedings. In short, the situation to my mind tells plainly that the decedent was in such a mental condition, when he left White Plains on July first and thereafter until his death, as to have been unable to form and have the intent of changing his domicile. It is to be noted that when he was talking to his doctor, just before leaving White Plains on July first, he repeatedly said that he would not make another will — that he had made a will giving everything to his grandchildren, and yet within a very few hours, at the Hotel Seymour in New York city, he executed transfers of all of his property to the contestant. Evidently she procured the Ohio will of August eighth as a further assurance of the success of her scheme to acquire his property.

Upon the contestant's side the evidence was meager. The manager of the hotel gave merely negative testimony. He had substantially no talk with the decedent and did not even know of the marriage. The contestant's daughter, Mrs. Barton, was

of course an interested or biased witness.    The evidence of the two experts for the contestant was based upon the hypothetical statement of facts, and of course necessarily begged the question of fact there and here involved.    The leading one of the experts, a doctor of excellent local repute in general practice, frankly admitted that senile dementia might produce mental incompetency, as indeed every one knows.    The notary public who took decedent's acknowledgment to the deed and mortgage assignment at the Hotel Seymour on July second was not produced as a witness or his absence accounted for.

I recommend, therefore, that the decree of the Surrogate's Court of Westchester county be reversed and a new trial ordered in said court, costs to abide the event.

While, under section 2763 of the Code of Civil Procedure, it appears that we have the power to decide the questions of fact upon the evidence, and, therefore, to decide that the decedent was still domiciled at White Plains in this State at the time of his death, I do not recommend that course because it seems to me that at the trial the contestant elected to take her chances upon the conclusive force of the record in the Ohio probate proceedings, and that she may now elect to attempt to prove here in the Westchester Surrogate's Court the alleged Ohio will, and I suppose it would be competent under the pleadings for her to undertake to do so.

Carr, Stapleton, Rich and Putnam, JJ., concurred.

Decree of the Surrogate's Court of Westchester county reversed and new trial ordered in said court, costs to abide the event.