Howard J. McEACHRON, Guardian of Douglas H. McEachron, his ward, and Douglas H. McEachron, as ward of Howard J. McEachron, his Guardian, Plaintiffs,

v.

Shawn R. GLANS; James D. Bowen, as Sheriff of the County of Saratoga; Saratoga County Sheriff's Department; and County of Saratoga, Defendants, Third–Party Plaintiffs, Counter–Defendants and Cross Defendants,

v.

TOWN OF WILTON, Third–Party Defendant, Counter–Claimant and Cross–Claimant.

No. 96–CV–1345 (DRH).

United States District Court, N.D. New York.

Nov. 7, 1997.

Cade & Saunders, P.C. (William J. Cade, of Counsel), Albany, NY, for Plaintiffs.

Pennock & Breedlove, LLP (John H. Pennock, Jr., of Counsel), Clifton Park, NY, for Saratoga County Defendants.

Brooks & Meyer (James Brooks, of Counsel), Lake Placid, NY, for Town of Wilton.

## MEMORANDUM–DECISION AND ORDER

HOMER, United States Magistrate Judge.

Presently pending is the defendants' motion to dismiss the complaint pursuant to Fed.R.Civ.P. 12(b)(1) for lack of subject matter jurisdiction. Docket No. 19. Defendants contend that there did not exist diversity of citizenship between plaintiffs and defendants. For the reasons which follow, that motion is granted.

### I. Background [1]

In their complaint plaintiffs allege that on March 28, 1996, a vehicle operated by plaintiff Douglas H. McEachron was struck by a Saratoga County Sheriff's Department vehicle operated by defendant Shawn R. Glans on a road in the Town of Wilton. It is undisputed that as a result of the collision, Douglas

---

1. An evidentiary hearing on this motion was held on September 17, 1997. Plaintiff called three witnesses to testify—Dr. William Burke, Melinda McEachron and Howard McEachron. All three parties introduced various exhibits into evidence during the hearing (referred to herein as "Ex."). The facts found in this decision are based on the pleadings filed by the parties on this motion and from the evidence presented at the hearing.

McEachron suffered severe head trauma and has since remained comatose. On March 28, 1996, Douglas McEachron was domiciled in New York. He resided in a mobile home with Melinda McEachron on property they owned at 17 Smith Bridge Road, Saratoga Springs, New York. Douglas and Melinda McEachron had four children ranging in age from seventeen to twenty-six. The oldest, plaintiff Howard J. McEachron, and the youngest, Candace McEachron, resided with their parents. Douglas McEachron operated an automobile body repair business in Saratoga County and, until the collision, resided in that county at all times except for a brief period in 1995 when the family temporarily relocated to Nevada before returning to Saratoga County.

Douglas McEachron was admitted to Albany Medical Center Hospital in Albany, New York immediately following the collision. He was transferred to Hilltop Manor Nursing Home in Niskayuna, New York six weeks later. On July 23, 1996, Douglas McEachron was transferred to New England Rehabilitation Hospital (NERH) in Woburn, Massachusetts.[2] The transfer decision was made by his family after consultation with medical experts and their counsel. The decision was viewed from the outset as a temporary transfer of six to eight weeks for the purpose of obtaining short-term, intensive therapy for Douglas McEachron. Thereafter, he would be transferred to a long-term care facility.[3] The long-term care facility selected was to depend on the progress which Douglas McEachron made at NERH. Howard and Melinda McEachron intended to reside near

to whatever facility was chosen for Douglas. Howard, Melinda and Candace McEachron moved to Woburn with Douglas. Prior to August 14, 1996, Howard and Melinda obtained Massachusetts drivers licenses, signed a one-year lease for an apartment in Woburn, opened a checking account, registered to vote, filed changes of address with the Postal Service and credit card companies, obtained telephone, cable television and power services, and moved "everything" from New York to Woburn. On July 26, 1996, a Massachusetts court appointed Howard McEachron the temporary guardian of Douglas McEachron. Candace McEachron registered for school in Woburn for the school year beginning in September.[4]

Douglas McEachron remained at NERH for eleven weeks. On August 14, 1996, while Douglas McEachron remained at NERH, this action was commenced. Docket No. 1. On October 11, 1996, Douglas McEachron was transferred from NERH to Willowood Nursing Home, a long-term care facility in Williamstown, Massachusetts,[5] where he has remained to date. The decision to transfer Douglas McEachron to Willowood was made by Howard and Melinda McEachron at some point after August 14, 1996. Howard and Melinda McEachron determined that no facility in New York provided adequate care and treatment for an individual, like Douglas, who had suffered traumatic brain injury ("TBI"). Willowood was recommended to them by the staff at NERH as the facility closest to New York specializing in TBI and was selected for that reason.[6] At the same

---

2. Woburn is approximately 180 miles east of Saratoga County.

3. At the evidentiary hearing held on September 17, 1997, there was conflict in the evidence over whether Howard and Melinda McEachron understood that the transfer to NERH was temporary or believed it was permanent. I find from the evidence that Howard and Melinda McEachron knew and understood from the time of the transfer to NERH that Douglas McEachron's stay there was temporary. *See, e.g.,* Ex. D–6, p. 2; Affs. (Docket No. 22) of Howard McEachron at ¶ 17–21; Melinda McEachron at ¶¶ 12–15; Sandra Suduikis at ¶¶ 4–6.

4. Plans for Candace later changed. She returned to Saratoga County in late August to live with a friend and attended school there.

5. Williamstown is located approximately fifty miles east of Saratoga County.

6. In an affidavit submitted by plaintiffs in opposition to this motion, a doctor at NERH stated:

> [D]uring the family conferences both Howard and Melinda McEachron requested that we recommend a long term care facility that, first and foremost, met Doug's needs and secondly, and only if possible, one that was closer to certain family members in the Saratoga Springs, New York area; the case worker and I recommended the Willowood Nursing Home in Williamstown, Massachusetts.

Aff. Of Dr. Sandra Suduikis (Docket No. 22) at 1 6.

time Howard and Melinda McEachron terminated their apartment lease in Woburn and rented an apartment together under a month-to-month lease in North Adams, Massachusetts, approximately five miles east of Williamstown, where they too remain.

## II. Discussion

The complaint alleges jurisdiction exists in this case "founded upon diversity of citizenship ... under 28 U.S.C. § 1332." Docket No. 1 at ¶¶ 1. Section 1332(a) states in pertinent part that "[t]he district courts shall have original jurisdiction of all civil actions where the matter in controversy ... is between—(1) citizens of different states...." For purposes of diversity jurisdiction, an individual is a citizen of the state where he or she is domiciled. *Galva Foundry Co. v. Heiden,* 924 F.2d 729, 730 (7th Cir.1991); *Chappelle v. Beacon Communications Corp.,* 863 F.Supp. 179, 181 (S.D.N.Y. 1994). Domicile must be determined from the physical presence of an individual and the individual's intention to remain there indefinitely. *Borsack v. Chalk & Vermilion Fine Arts, Ltd.,* 974 F.Supp. 293, 297 (S.D.N.Y. 1997); *Kubin v. Miller,* 801 F.Supp. 1101, 1110 (S.D.N.Y.1992).

Section 1332 mandates that diversity exists at the time the action is commenced. *Lundquist v. Precision Valley Aviation, Inc.,* 946 F.2d 8, 10 (1st Cir.1991); *Hakkila v. Consolidated Edison Co. of N.Y., Inc.,* 745 F.Supp. 988, 990 (S.D.N.Y.1990). Diversity need not exist when a claim arose. *Lewis v. Lewis,* 358 F.2d 495, 502 (9th Cir.1966); *Bair v. Peck,* 738 F.Supp. 1354, 1356 (D.Kan.1990); *Abbott v. United Venture Capital, Inc.,* 718 F.Supp. 823, 826 (D.Nev.1988). If diversity did not exist when the action was commenced, it cannot thereafter be retroactively created by the change in domicile of a party. *Goldsmith v. Mayor & City Council of Baltimore,* 845 F.2d 61, 62 (4th Cir.1988); *Field v. Volkswagenwerk AG,* 626 F.2d 293, 304 (3d Cir.1980). If diversity existed when the action was commenced, it is not removed by the subsequent change in domicile of a party. *Rosado v. Wyman,* 397 U.S. 397, 405, 90 S.Ct. 1207, 1214, 25 L.Ed.2d 442 (1970); *Ak-*

*zona, Inc. v. E.I. du Pont de Nemours & Co.,* 662 F.Supp. 603, 608 (D.Del.1987).[7]

A presumption exists that domicile in one state continues until another is acquired; domicile is not destroyed by mere absence from the domiciliary state. *Willis v. Westin Hotel Co.,* 651 F.Supp. 598, 603 (S.D.N.Y.1986). Once a party has established a domicile, the burden of demonstrating that a new domicile has been established rests with the person seeking to establish the change. *National Artists Management Co., Inc. v. Weaving,* 769 F.Supp. 1224, 1228 (S.D.N.Y.1991). The party asserting a change of domicile must prove physical presence in the new domicile coupled with intent to remain indefinitely by clear and convincing evidence in order to rebut the presumption that a person retains the former domicile until acquiring a new one. *Katz v. Goodyear Tire and Rubber Co.,* 737 F.2d 238, 243 (2d Cir.1984).

For purposes of determining diversity jurisdiction, "the legal representative of an ... incompetent shall be deemed to be a citizen only of the same State as the ... incompetent." 28 U.S.C. § 1332(c)(2). There is no dispute that on March 28, 1996, Douglas McEachron was domiciled in New York and that he became incompetent on that date. Plaintiffs contend, however, that prior to the filing of the complaint on August 14, 1996, Douglas and Howard McEachron, Douglas' legal guardian, changed their domicile to Massachusetts, thus creating diversity of citizenship from the defendants.

There exists a division of authority as to whether an individual who is or has become incompetent is capable of forming the intent necessary to change his or her domicile. A majority of the courts which have considered the issue have held that circumstances may exist where the domicile of an incompetent person may be changed by a guardian after the onset of incompetency. For example, in *Rishell v. Jane Phillips Episcopal Mem'l Med. Ctr.,* 12 F.3d 171 (10th Cir.1993), the court held that:

the existence of diversity at the time the action was commenced on August 14, 1996.

---

7. The parties stipulated during the evidentiary hearing that the issue of diversity was limited to

If the best evidence available shows the incompetent likely will never be restored to reason, the law must allow another, vested with legal authority, to determine domicile for the best interests of that person. To prohibit such determinations is to leave the incompetent in a never-ending limbo where the presumption against changing domicile becomes more important than the interests of the person the presumption was designed to protect.

*Id.* at 173. The Third Circuit followed *Rishell* in *Juvelis by Juvelis v. Snider*, 68 F.3d 648, 654 (3d Cir.1995)(for purposes of determining entitlement to state benefits, domicile of incompetent adult held to be in Pennsylvania where he had resided for many years although domicile of parents was elsewhere). These holdings have been followed as well in two district court cases. *See Last v. Elwyn, Inc.*, 935 F.Supp. 594, 598–99 (E.D.Pa. 1996)(in negligence action by incompetent adult against Pennsylvania school where he resided, domicile held to be that of parents in New York); *Love v. Roosevelt Hosp.*, No. 92 Civ. 4211(JSM), 1993 WL 190345 (S.D.N.Y. June 2, 1993)(defendants' motion to dismiss for lack of diversity denied in negligence action where guardian moved incompetent person from New York to Massachusetts three weeks before complaint filed).[8]

The Fourth Circuit has rejected this approach. In *Long v. Sasser*, 91 F.3d 645 (4th Cir.1996), the court affirmed the dismissal of a negligence action for lack of diversity where a guardian had moved the incompetent person to a nursing home in another state, thereby creating diversity of citizenship between the parties. Explicitly rejecting *Rishell*, the court held that "[j]urisdictional rules should be clear" and, therefore, an individual adjudged incompetent could only change domicile if "sufficient understanding and mental capacity to make an intelligent choice of domicile" was thereafter acquired. *Id.* at 647. *Long*, however, represents a minority view and, if accepted, would restrict forever the domicile of an incompetent person to that which existed at the onset of incompetence in furtherance of jurisdictional clarity. The better rule appears to be that followed in *Rishell, Last* and *Love* which focuses on the facts of each case rather than the application of an arbitrary rule.

■■■ Under those cases the change in domicile of an incompetent person requires a party to establish physical presence in the new state and an intent to remain indefinitely, the standard elements of the domicile inquiry, as well as that the change was made in the best interests of the incompetent person. *See Juvelis by Juvelis*, 68 F.3d at 656; *Rishell*, 12 F.3d at 173; *Love*, 1993 WL 190345, at *1; *Gibbs*, 399 N.Y.S.2d at 306. It is also clear that the party seeking a change of domicile bears the burden of establishing that change. *Last*, 935 F.Supp. at 597. In determining the best interest of an incompetent person, a court must consider a " 'mosaic of circumstances' surrounding an incompetent individual's assertion of domicile." *Juvelis by Juvelis*, 68 F.3d at 656.

■■■ Douglas McEachron clearly was physically present in Massachusetts when this action was commenced on August 14, 1996. It is also clear that as of August 14, Howard McEachron's transfer of Douglas to NERH was in Douglas' best interests. According to the record, NERH and another facility in Connecticut offered the two best choices for the short-term, intensive therapy which Douglas McEachron then required. Plaintiffs have satisfied their burden of demonstrating that the transfer of Douglas McEachron to NERH was in his best interests.

The issue, then, is whether plaintiffs have met their burden of establishing their intent to remain indefinitely in Massachusetts as of August 14. Dr. William Burke, a rehabilitation specialist retained by plaintiffs, testified that Douglas McEachron required intensive physical therapy which he was not receiving at Hilltop Manor in New York. Dr. Burke advised Howard and Melinda McEachron

---

**8.** Both *Rishell* and *Love* cite a New York case as persuasive authority. In *Gibbs · v. Berger*, 59 A.D.2d 282, 399 N.Y.S.2d 304 (3d Dep't 1977), the court held that under New York law, "a conservator who is a close and appropriate relative with natural instincts of acting in the best behalf of an incompetent may, without court order, change the incompetent's domicile if done in good faith and in the best interest of the conservatee." *Id.*, 399 N.Y.S.2d at 306.

that the two best facilities for the care and treatment of the TBI suffered by Douglas McEachron were located in Massachusetts and Connecticut. Both were short-term care facilities. The location to which Douglas McEachron would ultimately be transferred for long-term care depended on how he responded to the intensive, short-term therapy. After investigating the two facilities, Howard and Melinda McEachron selected NERH for Douglas McEachron's short-term stay. He was transferred there on July 23, 1996.

The record does not indicate the precise date on which it was decided that Douglas McEachron would be transferred to Willowood, but it is sufficiently clear from the record that this decision had not been made as of August 14. Thus, as of that date Douglas McEachron had not yet acquired a new domicile. While physically present in Massachusetts on that date by virtue of his hospitalization at NERH, his stay there was temporary. *See* footnote 3 *supra.* The location of the facility to which he would inevitably be transferred from NERH was then unknown and would not be decided for several weeks yet.

■ While it appears from the record that Douglas, Howard and Melinda McEachron had abandoned their residence in New York as of August 14, and while it appears that Howard and Melinda McEachron took every conceivable step to establish their own domicile in Massachusetts as of that date,[9] it remained uncertain as of that date whether Douglas McEachron would ultimately be placed at a facility in Massachusetts, Connecticut, Vermont, New Hampshire or any other state, including New York. *See* footnote 6 *supra.* The fact that two months later Douglas McEachron was transferred to a facility still in Massachusetts does not obviate the fact that as of August 14, no such decision had been made. Since the domicile of Howard McEachron was in fact dependent at that time on the domicile of Douglas McEachron, Howard McEachron's ultimate

state of residence remained similarly uncertain on that date. *See* 28 U.S.C. § 1332(c)(2).

■ Circumstances may exist where one temporarily residing in a new state may satisfy the requirements for a change of domicile by demonstrating an intent to remain even beyond the temporary stay. For example, while a student attending school in a state different from his or her parents generally retains the domicile of the parents, a student may establish domicile in the state of the school by demonstrating an intent to remain there even after school is completed. *See Mitchell v. Mackey,* 915 F.Supp. 388, 391 (M.D.Ga.1996). The same may apply to one temporarily residing in another state because of military or public service, incarceration or any other circumstance. *See Stifel v. Hopkins,* 477 F.2d 1116, 1124 (6th Cir.1973). Here, however, no such intent was or could be demonstrated as of August 14 given the uncertainty of the location of the facility for Douglas McEachron's long-term care.

What appears from the record here, then, is that as of August 14, 1996, the McEachrons had demonstrated an intent to leave New York. However, since no decision concerning a long-term care facility for Douglas McEachron could be made until he completed his short-term therapy at NERH, a final decision on the state in which the McEachrons would permanently reside could not have been made, and was not, as of that date. Because domicile remains until a new domicile is established, the domiciles of the McEachrons remained New York until Douglas McEachron's transfer to Willowood over two months later. The temporary transfer of Douglas McEachron to a short-term care facility in Massachusetts, even if accompanied by the move of Howard and Melinda McEachron, did not suffice in these circumstances to establish a change of domicile from New York. Plaintiffs have, therefore, failed to meet their burden of demonstrating that on August 14, 1996, there existed diversity of citizenship between plaintiffs and defendants.

9. Defendants contend that plaintiffs attempted to manufacture diversity jurisdiction here by moving to Massachusetts. *See, e.g.,* Town of Wilton Mem. of Law (Docket No. 33) at pp. 12–13 (unnumbered). However, the motive for moving to

another state, even if to obtain diversity jurisdiction, is immaterial to the issue of whether jurisdiction existed when the complaint was filed. *Peterson v. Allcity Ins., Co.,* 472 F.2d 71, 74 (2d Cir.1972).

### III. Conclusion

For the reasons stated above, it is hereby

**ORDERED** that the motion of the defendants to dismiss the complaint pursuant to Fed.R.Civ.P. 12(b)(1) is **GRANTED** and the complaint is ordered dismissed; and

**IT IS FURTHER ORDERED** that the Clerk of the Court shall serve copies of this order by regular mail upon the parties to this action.

**IT IS SO ORDERED.**