[10 NYS3d 797]

In the Matter of Public Administrator of Kings County, as
Administrator of the Estate of Palma Bonora, Deceased.

Surrogate's Court, Kings County, March 28, 2014

**APPEARANCES OF COUNSEL**

*Passarello & La Rosa*, Staten Island, for Richmond County Public Administrator.

*Cullen & Dykman, LLP*, New York City, for Kings County Public Administrator.

## OPINION OF THE COURT

MARGARITA LÓPEZ TORRES, J.

This case presents a singular situation in which a public administrator of one county, in this case Richmond, proceeded to obtain letters of administration with knowledge that another public administrator in another county had already been duly appointed to act as fiduciary of an estate.

The decedent, Palma Bonora, died on July 12, 2013. Subsequently, on December 6, 2013, this court issued temporary letters of administration to the Kings County Public Administrator (the KCPA). Thereafter, on December 16, 2013, the KCPA received full letters of administration.

The Richmond County Public Administrator (the RCPA), a New York City Commissioner, with knowledge of the issuance of letters to the KCPA, chose to ignore the duly issued decree of this court because he believed that he, and not the KCPA, had the authority to act as fiduciary of the estate. Rather than

file a petition in this court under SCPA 711, or any other provision, to revoke the KCPA's letters, the RCPA instead proceeded with a petition in the Richmond County Surrogate's Court (the Richmond Court) for letters of administration, which he had, unbeknownst to the KCPA, filed on November 8, 2013.[1] The RCPA was granted temporary letters on December 13, 2013 by the Richmond Court, and then full letters on December 30, 2013. Unlike the KCPA's petition, which was fact laden and included documents showing the decedent's residential and medical history and place of eventual death, the RCPA, at least in its filings to the Richmond Court, failed to disclose that full letters had already issued to the KCPA, nor was the history of the decedent's change of residence included in his petition.

The RCPA has created an untenable situation in which the KCPA, in order to fulfill his fiduciary obligations, has had to commence a turnover proceeding against the RCPA and other parties seeking turnover of all assets belonging to the decedent. The RCPA has not filed an answer to the turnover proceeding. Instead, he has now filed a motion seeking: (i) a stay of all proceedings in this court until the Richmond County Surrogate's Court has decided the proper venue for the estate; (ii) transfer of all proceedings in Kings County to Richmond County; and (iii) revocation of the KCPA's letters of administration pursuant to SCPA 711 (4) because they were allegedly obtained in bad faith in that the decedent was allegedly domiciled in Richmond County and the KCPA's attorneys were aware that an administration proceeding would be filed in Richmond County. The KCPA has filed papers in opposition.

Background

The decedent was born on March 20, 1921, and it is undisputed that while she was competent she was a life-long resident of Kings County. The decedent never married and had no children, and is survived only by alleged cousins. The decedent was the subject of a Mental Hygiene Law article 81 proceeding, which was commenced in Kings County Supreme Court. At that time, the decedent lived in Kings County at the Saints Joachim & Anne Residence, 2720 Surf Avenue (the JA residence), where she had resided since September 2004. Prior to moving to the JA residence, the decedent lived in a house lo-

---

1. The KCPA moved to intervene in the proceedings in Richmond County when it learned of the RCPA's petition, which motion was decided by that court on March 20, 2014 (*Matter of Bonora*, 44 Misc 3d 171 [Sur Ct, Richmond County 2014]), and is discussed more fully below.

cated at 2965 86th Street in Kings County. On July 27, 2006, the Kings County Supreme Court appointed guardians of her person and property, Neil Mauriello and Margaret Alverson, Esq., respectively. On February 22, 2008, because she was suffering from pneumonia, the decedent was transferred from the JA residence to Coney Island Hospital in Brooklyn. Then, on March 31, 2008, the decedent's guardian of the person had her removed to St. Elizabeth Ann's Health Care & Rehabilitation Center in Richmond County because she needed medical equipment which was not available at the JA residence. It is not disputed that the decedent was mentally incompetent before, during, and after her guardian moved her to the Richmond County health care facility. She died on July 12, 2013, at Richmond University Medical Center located in Richmond County.

## Pursuant to SCPA 704 the KCPA Has Exclusive Authority

Turning to the RCPA's motion, revocation of a fiduciary's letters may not be obtained by motion; instead a proceeding must be commenced by verified petition. Notwithstanding, in the interests of judicial economy and on the consent of the parties, the court will determine the motion for revocation and underlying petition for a turnover.

The KCPA's application for temporary and full letters was supported by over 20 exhibits which apprised the court of the locale of the decedent's death, her health history and the basis for application for letters of administration in Kings County. The petition also cited one alleged cousin and the Attorney General as interested parties. At the time the KCPA filed his petition, no fiduciary, temporary or permanent, had been appointed for the estate. There was no effort by the KCPA to secrete the proceedings in this county, nor any evidence of bad faith.

██ Nevertheless, even the singular fact that the KCPA received temporary and full letters prior to the RCPA would give the KCPA *sole* authority to administer the estate. The SCPA is clear and unambiguous, leaving no room for competing interpretations, that the person to whom letters are first issued has exclusive fiduciary authority. Pursuant to SCPA 704:

> "*A person* who applies in good faith therefor, and *to whom letters are first issued from a court having jurisdiction* to issue them, has *exclusive authority* under the letters until they are revoked. He is entitled to demand and recover from any person to

whom letters are afterwards issued by any other surrogate's court the property in his hands belonging to the estate. But the acts of a person to whom letters were afterwards issued, done in good faith before notice of the letters first issued are valid and an action or special proceeding commenced by him may be continued by and in the name of the person or persons to whom the letters were first issued." (Emphasis added.)

There is no dispute that both temporary and full letters in this estate were issued to the KCPA prior to those issued to the RCPA. Therefore, under SCPA 704 there can be no discretion or manipulation; the statute grants the KCPA exclusive authority to administer the estate. As such, under the facts of this case, that the RCPA filed his petition first is of no consequence.

There is only one published decision discussing SCPA 704, *Matter of Dolansky* (196 Misc 802 [Sur Ct, Schenectady County 1949]). *Dolansky* holds that "[i]t is well settled that priority in point of time of filing a petition gives no advantage or preference to the first applicant for letters of administration . . . [to hold otherwise] would tend to encourage *unseemly* races to the Surrogate's Court from the deathbeds of intestates." (*Id.* at 807 [emphasis added].) SCPA 704's lack of ambiguity surely accounts for there being no other reported decisions interpreting the provisions of the statute. However, treatises also regard it as well settled that "the first person to receive letters has the exclusive authority to act until the letters are revoked." (Turano, Practice Commentaries, McKinney's Cons Laws of NY, Book 58A, SCPA 704 at 521 [1994 ed] [noting that SCPA 704's predecessor, Surrogate's Court Act § 91 was never the subject of litigation].) "[SCPA 704] gives priority only to the person to whom letters were 'first issued.' " (40 NY Jur 2d, Decedents' Estates § 1218.) Accordingly, the KCPA is the only fiduciary with exclusive authority to act in this estate.

## The Decedent's Domicile Remained in Kings County

As the party alleging a change in domicile, the RCPA has the burden to prove clearly and convincingly that the decedent changed her domicile to Richmond County. (*Matter of Newcomb*, 192 NY 238, 250 [1908].) An intention to change domicile is required and such intent cannot be formed, nor can a change in domicile be effected, by an incapacitated person. (*Matter of Horton*, 175 App Div 447, 453 [2d Dept 1916] [finding no change of domicile because decedent was in advanced

age and in "weak" mental and physical state].) The Second Department has determined that a person's admission into a medical facility does not change her domicile: "[I]t is generally held that an incapacitated person's admission into a healthcare facility does not cause a change of domicile if the incapacitated person is unable to express an intention to establish a new domicile." (*Matter of Urdang*, 194 AD2d 615, 616 [2d Dept 1993]; *see also Matter of Rottenberg*, 19 Misc 2d 202, 203 [Sur Ct, NY County 1959].) In *Matter of Ratkowsky v Browne* (267 App Div 643, 646 [3d Dept 1944]), the Third Department likewise held that a person who sold her New York apartment and moved to Connecticut solely for medical treatment still maintained a New York domicile. The law in New York is therefore well settled that "an adult who has been adjudged an incompetent retains the domicile which he had at the time he became incompetent" (*Matter of Webber*, 187 Misc 674, 676 [Sur Ct, Kings County 1946]), because such adult is incapable of a "voluntary change of domicile." (*Id.*, citing *Matter of Horton*, 175 App Div at 453.)

▮ Faced with such established law, the RCPA instead argues that the decedent's guardian changed the domicile to Richmond County when he removed the decedent to Richmond County. However, this argument does not overcome the requirements of capacity and intent, nor does it address the case law which holds that a relocation for medical treatment does not effect a change in domicile. (*See Matter of Urdang*, 194 AD2d 615 [1993]; *Matter of Rottenberg*, 19 Misc 2d 202 [1959]; *Matter of Ratkowsky v Browne*, 267 App Div 643 [1944].)

The RCPA is not the first to argue that a guardian may change her ward's domicile. In *Matter of Webber*, the argument that the committee for an incompetent person (the predecessor to today's article 81 guardian) may change an incompetent's domicile was found to be without merit: "[A guardian] may, for the convenience and welfare of the incompetent, change the incompetent's residence or place of abode, but such a change of residence does not effect a change of domicile." (187 Misc at 677.)[2] Here, the Kings County Supreme Court only granted the guardian of the person authority to change the decedent's

---

2. Although the committee in *Webber* had sold the incompetent's home, this fact did not bear on that court's analysis. Similarly, contrary to the RCPA's arguments, it does not bear on the decedent's domicile that her home was demolished and the land sold without her consent prior to her being removed to Richmond County.

abode, it *never* granted the guardian the authority to change the decedent's domicile. Abode and domicile are not one and the same. The two terms are different and have been treated differently by courts because a change in domicile affects many significant rights and obligations. Moreover, there is nothing in the record, or even alleged, concerning "acts undertaken by the decedent that could be viewed as proof of her intention to change her domicile." (*Matter of Pingpank*, 134 AD2d 263, 265 [2d Dept 1987].)

The arguments advanced by the RCPA have been adopted by the Richmond Court in its March 20, 2014 decision and order (Richmond decision) on the KCPA's motion to intervene in the proceeding pending before that court.[3] This court respectfully disagrees with and finds that the established law is contrary to that set forth by the Richmond Court. First, the Richmond Court's holding that it has priority to decide the issue of domicile because a petition in this estate was first filed in Richmond County is erroneous. None of the cases it cites for that proposition—*Matter of Simonetti* (30 AD3d 530 [2d Dept 2006]), *Matter of Margolin* (129 Misc 2d 735 [Sur Ct, NY County 1985]), *Matter of Bareuther* (NYLJ, June 17, 1998 at 25, col 5 [Sur Ct, NY County 1998])—presented facts where letters had issued to a fiduciary by a court, as is the case here. Once letters have issued, pursuant to SCPA 704, "exclusive authority" is vested in the county which first issued the letters. Accordingly, since the KCPA has statutory exclusive authority to act as fiduciary, only this court may determine whether to revoke the KCPA's letters of administration.

The Richmond decision further determined that the decedent's guardian had implicit authority to change the decedent's domicile based on a "mosaic of circumstances." However, the cases cited by the Richmond Court do not present circumstances or facts similar at all to this matter, nor support its decision.

*McEachron v Glans* (983 F Supp 330 [ND NY 1997]), cited by the Richmond Court, is a federal case in which the court had to determine whether the plaintiff was a resident of Massachusetts for purposes of diversity jurisdiction with a New York defendant. The plaintiff suffered serious injuries and was

---

**3.** The Richmond Court granted the KCPA's intervention and in its decision and order went on to hold that the decedent was domiciled in Richmond County. It further directed the RCPA to administer the estate (*Matter of Bonora*, 44 Misc 3d 171 [2014]).

comatose as the result of a car accident involving a vehicle owned by Saratoga County in New York. After consultation with his doctors, the incapacitated's family moved him to Massachusetts believing that no facility in New York could provide the level of treatment for brain trauma which could be provided in Massachusetts. The incompetent's parents moved to Massachusetts, obtained drivers' licenses there, registered to vote, all in the vicinity of the Massachusetts facility. They also signed a lease, obtained telephone, cable and power service at their new home near their incapacitated son in Massachusetts. The father petitioned a Massachusetts court to become the son's guardian and the petition was granted. Finally, the parents also enrolled their daughter in school in Massachusetts and she, too, was a plaintiff in the federal court action. But even with that "mosaic of circumstances," which are not present here, the federal court in *McEachron* found that the incapacitated patient's domicile had *not* changed to Massachusetts. Thus, *McEachron*'s pronouncements as to the possibility that an incompetent's domicile could be changed in this manner are mere dicta. Moreover, the *McEachron* court's analysis was conducted under a federal statute, 28 USC § 1332 (c) (2), governing diversity jurisdiction involving incompetents, making it further inapplicable to this case.

The second case relied upon in the Richmond decision is *Matter of First Trust & Deposit Co. v Goodrich* (3 NY2d 410 [1957]). That case considered whether infants became domiciliaries of California, and thereby exempt from New York tax liability when the New York Surrogate's Court approved a petition for guardianship by their cousins who resided in California. The State of New York wished to tax the children's incomes although they did not reside in New York for a single day of the years for which taxes were sought. The Court of Appeals noted that it "was an open and manifest fact" that at the time of the petition, the guardians were permanent California residents, and thus found the Surrogate's Court order which issued guardianship letters for the infants had "been designed to send the[ ] children to California." (*Id.* at 416.) The court stated that it would be unreasonable to expect that the cousins would move to New York to become guardians of the infants and therefore there was implicit court approval for a change of domicile of the infants to California. Significantly, the court in *First Trust* was careful to tailor its ruling, stating:

"The mere transfer of a person to a sanitarium for treatment or confinement on account of mental illness does not alter the legal domicile. Infancy and incompetency are alike in that both involve disability, and in neither instance is the domicile ordinarily capable of being changed by an act of volition on the part of the ward. In this respect *infancy and incompetency are similar, but they are not comparable* where the domicile of an infant is changed by the natural guardian or by order of the court, as was pointed out by the Surrogate . . . in *Matter of Webber* (187 Misc. 674, 678)." (3 NY2d at 416 [emphasis added].)

The court also indicated that its holding may be different had the children been relocated "for confinement or cure." (*Id.*) Accordingly, the circumstances of that case, again, stray too far from the facts here to support a holding that court-appointed guardians have implicit authority to change a ward's domicile.

Finally, the Richmond Court cites *Matter of Gibbs v Berger* (59 AD2d 282 [3d Dept 1977]) in holding that the guardian had the authority and did in fact change the decedent's domicile to Richmond County. The subject person in *Gibbs* suffered a severe brain stem injury as the result of a car accident suffered in California which rendered her comatose. A month before the accident, the incapacitated person had expressed her clear intent to return to New York, where she was from, and where her family was located. The patient's mother brought her back to New York, and New York denied the patient Medicaid benefits on the basis that her domicile was California. California had already discontinued Medicaid due to the patient's move to New York. First, this case was decided under Social Services Law § 366 (1) (b)[4] which provided that a non-resident is not eligible for such medical assistance unless, inter alia, that person while "temporarily in the state, requires immediate medical care which is not otherwise available, provided that such person did not enter the state for the purpose of obtaining such medical care." The court concluded that "within the meaning of [Social Services Law § 366 (1) (b)]" a conservator "who is a close and appropriate relative with natural instincts of acting in the best behalf of an incompetent" may change the ward's domicile without court order if "done in good faith and in the best interests of the conservatee." (*Id.* at 286.) As with the other two cases, *Gibbs* has no bearing on the

---

4. Now, Social Services Law § 366 (1) (d) (1).

guardian's authority here. *Gibbs* limited its holding to the Social Services Law and carved out an exception to the long-standing rule that a guardian may not change her ward's domicile based on very sympathetic facts presented therein. The guardian there was the patient's mother, not a stranger, and the disputed domicile was her original home, not a county to which the person had no link while capacitated. Moreover, the patient had clearly expressed her intent to return to New York.

These cases taken separately or together do not present a wholesale change in New York law governing a guardian's authority to change domicile without express court approval. Nor do they present an evolving change from the basic premise that a guardian may not change an incompetent's domicile. It is clear that the "mosaic of circumstances" in those three cases are nowhere found in the facts herein.

Based on the foregoing, the RCPA has not met his burden to present "clear, credible and convincing evidence of the [decedent's] requisite intention" to change her domicile. (*Matter of Beckmann*, 1987 WL 1451553 [Sur Ct, NY County 1987, Roth, S.].) In fact, there was no intention whatsoever and "[n]o change of domicile can be validly effected by a person of such a weak and unsound mind that he or she can have no intent to make such change." (*Id.* [citations omitted].) In this case, where there is no dispute that the decedent was incompetent at the time she was moved to Richmond County, she lacked "sufficient mental capacity to form and have the requisite intent to change [her] domicile." (*Matter of Horton*, 175 App Div at 451.)

The Decedent's Property Remains Subject to Kings County Jurisdiction

■ Furthermore, Kings County Surrogate's Court has jurisdiction of this matter because all of the decedent's assets were subject to the Kings County Supreme Court's order, and management of those funds was invested in a property guardian appointed by that court. Indeed, on November 18, 2013, the property guardian filed her final account of the decedent's property with the Kings County Supreme Court. Under Mental Hygiene Law § 81.44 (c) (1), the property guardian is required to serve a notice of death on the public administrator *"of the county in which the guardian was appointed"* (emphasis added). Indeed, the guardian of the property served the required notice on the KCPA. Therefore the KCPA knew a Kings County domiciliary had died and the estate required administration. Significantly, Mental Hygiene Law § 81.44 (d) requires the

property guardian to deliver all of the decedent's property to the KCPA within 150 days of the decedent's death. Thus, the Mental Hygiene Law clearly indicates that as far as estates of incapacitated individuals are concerned, the county where they were domiciled when adjudicated incompetent retains a strong interest in their estates.[5]

Conclusion

For all of the foregoing reasons, the motion of the Richmond County Public Administrator is denied. The petition commenced by the Kings County Public Administrator pursuant to SCPA 2103 to discover and for a turnover of property is granted as follows: Property guardian, Margaret E. Alverson, Esq., shall forthwith turn over all estate assets held by her to the Kings County Public Administrator. The Richmond County Public Administrator, a Commissioner of the City of New York, shall immediately turn over any assets belonging to the estate to the Kings County Public Administrator as well as all documents concerning the estate. Merrill Lynch shall immediately turn over all assets belonging to Palma Bonora and the estate of Palma Bonora to the Kings County Public Administrator. Finally, both Margaret E. Alverson, Esq. and Merrill Lynch shall turn over all account statements, valuation of assets, insurance policies, income and estate tax returns to the Kings County Public Administrator.

---

**5.** While the KCPA filed objections to the property guardian's account because, inter alia, she failed to itemize any expenditures, income, or principal as a fiduciary is required to do, the RCPA has accepted the account as stated. The court also notes with concern that the RCPA filed tax returns for the estate without requesting an extension of time to pay, which may result in significant penalties for the estate.